354 So.2d 1070 (1978)
Cleo Allen BUTLER, Individually, and Cleo Allen Butler, for and on behalf of her minor daughter, Michelle Butler
v.
FLINT-GOODRIDGE HOSPITAL OF DILLARD UNIVERSITY, Dr. Jerome Medley and Dr. Warren P. McKenna, Jr.
No. 8739.
Court of Appeal of Louisiana, Fourth Circuit.
January 11, 1978.
Rehearing Denied February 14, 1978.
Darleen M. Jacobs, New Orleans, for plaintiff-appellant.
*1071 Lemle, Kelleher, Kohlmeyer & Matthews, H. Martin Hunley, Jr., John M. Sartin, Jr., Adams & Reese, Lawrence L. McNamara, Robert J. Conrad, Jr., New Orleans, for defendants-appellees.
Donald B. Ensenat, Asst. Atty. Gen., Sanders, Downing, Kean & Cazedessus, John V. Parker, Stewart M. Thomas, Baton Rouge, amicus curiae for defendants-appellees.
Before GULOTTA, BEER and BOWES, JJ.
BEER, Judge.
Plaintiff, Cleo Allen Butler, individually and on behalf of her minor child, Michelle Butler, sued Flint-Goodridge Hospital of Dillard University, Dr. Jerome Medley and Dr. Warren P. McKenna, Jr., seeking to recover damages in the total amount of four million dollars allegedly resulting from defendants' negligence and malpractice.
Defendants, relying upon R.S. 40:1299.47 B (Act 817 of 1975), separately filed dilatory exceptions of prematurity, contending that no such claim against "health care providers" may be commenced in a Louisiana court unless first submitted to a "medical review panel."
On September 24, 1976, the district court maintained the exception filed in behalf of Flint-Goodridge Hospital and dismissed plaintiff's suit against that institution. On March 25, 1977, the exceptions of prematurity filed in behalf of Drs. Medley and McKenna[1] were also maintained and plaintiff's suit against them was dismissed.
With all defendants thus discharged, plaintiff sought and obtained an order for a suspensive appeal under date of April 14, 1977, returnable to this court on June 8, 1977.
On May 3, 1977, Drs. Medley and McKenna moved this court to dismiss the appeal on grounds discussed in our written denial of that motion dated June 7, 1977.
On June 23, 1977, counsel for plaintiff joined with the Attorney General in moving this court to make the Attorney General a party to this action. That motion was discussed and denied by our written order of June 30, 1977.
On December 8, 1977, the matter came before us for appellate review of the trial court's action in maintaining the exceptions of prematurity and was following extensive and able oral argument, submitted for adjudication.
By informal letter dated December 13, 1977, to all counsel of record (including those who had sought and been granted permission to file amicus briefs), we noted the pendency of Everett v. Goldman, et al., 351 So.2d 1209 (No. 60,959 on the docket of the Supreme Court of Louisiana), and called attention to the fact that same was set for argument before that court some time within the next few weeks.[2] We took the somewhat unusual step of soliciting counsel's response to our tentative view that we should defer ruling in this matter, awaiting the Supreme Court's apparently controlling decision in Everett v. Goldman, et al., supra.
Those responses and our own independent consideration of the matter prompted us to conclude that we should, without further delay, address the single major issue which we deem to be properly before us: The constitutionality, vel non, of the statutory procedure requiring prior submission of medical malpractice claims to a medical review panel as provided in LSA-R.S. 40:1299.47 B.
Under the circumstances, we also will resolve the less critical issue: Is Flint-Goodridge excluded from the provisions of the statute here involved on the thesis that the term "hospital" does not include hospital or care facilities maintained by a university or college?
*1072 Medical review panels have been described as devices intended to reduce the number of medical negligence claims that go through the expensive and time-consuming process of extensive preparation and lengthy trial.[3]
The section of the statute which provides for the medical review panel[4] requires that medical malpractice claims against "health care providers" must be presented to and passed upon by a medical review panel before a judicial action may be commenced.[5] The panel is comprised of three physicians and an attorney who serves as an advisory chairman without vote.[6] Within five days of receipt of the proposed complaint, the insurance commissioner is obliged to acknowledge filing and advise the claimant of, defendant's status under the act and provide all defendants a copy of the complaint.[7] One physician is selected by the plaintiff, and within ten days another by defendant. The third is agreed upon by the two physicians selected or by lot if no agreement can be reached.[8] The attorney selection process is commenced by the clerk of the Supreme Court, who draws five names from a list of attorneys who reside in a parish which would be proper venue for the action in a judicial proceeding.[9] If an attorney cannot be agreed upon by the parties, four of the five names are alternately stricken by the parties from the list.
Each panel member is required to take an oath to discharge his duties in an unbiased and faithful manner and to render a decision in accordance with the law and the evidence.[10]
The panel is required to review the evidence submitted in accordance with the procedural aspects of the statute. After the record is complete, either party may convene the panel to question its members concerning any matter relevant to the issues to be decided by it prior to the issuance of its report.[11] Finally, the panel is directed by statute to express an expert opinion as to whether the evidence presented to it supports the conclusion that the defendant health care provider acted or failed to act within the appropriate standards of care charged by the complaint.[12] The opinion of the panel is limited to a statement as to whether the evidence supports the conclusion that the defendant failed to comply with the applicable standard of care or that there exists a material issue of fact bearing on liability suitable for consideration by the court which does not require expert opinion.[13] When negligence is found, the panel is further required to state its conclusion on causation and the nature and extent of the complainant's disability or impairment.[14]
The statute in question does not, by use of the medical review panel, deprive a litigant of his right to a trial by jury. Nothing in the statute denies or attempts to foreclose such a procedural right, and the prerequisite of submission of the matter to the medical review panel in no way infringes upon that right.
LSA-R.S. 40:1299.47 H specifically provides that any opinion rendered by the medical review panel shall not be conclusive. Hence, neither party is judicially bound by its opinion and the judge or jury is free to render a decision contrary to the panel's finding should the facts developed at the trial of the case (of which they are the sole arbiters) warrant such contrary *1073 conclusion. An additional safeguard is provided by allowing the members of the panel to be called as witnesses in a subsequent judicial proceeding, thereby assuring a litigant the right to demonstrate the basis for the panel's opinion and to expose any impropriety which may have formed part of the opinion reaching process.
Numerous state and federal statutes providing for administrative tribunals exercising quasi-judicial functions have generally been considered constitutionally sufficient as long as judicial review is available at some reasonable point. Here, however, the medical review panel is only empowered by statute to render an expert opinion, and even that opinion may be vigorously questioned and, in fact, impeached in a subsequent unlimited judicial proceeding. Accordingly, we cannot conclude that the acknowledged added step which the statute does clearly require has such drastic due process effect as to nullify or materially impede or impair the basic rights of any litigant.
Turning to the issue of special law versus general law, we find that the basic distinction has been carefully defined by the Supreme Court in Teachers' Retirement System of Louisiana v. Vial, 317 So.2d 179, 183 (La. 1975):
"General laws are those that operate equally and uniformly upon all persons brought within the relations and circumstances for which they provide or that operate equally upon all persons of a designated class founded upon a reasonable and proper classification. In contrast, a statute is special if it affects only a certain number of persons possessing the characteristics of the class. In essence, a special law is one directed to secure some private advantage or advancement for the benefit of private persons."
It is here that we perceive the real battle lines have been drawn and it is this area which causes us the greatest concern, for, unless it can be convincingly demonstrated that the provisions of the act stem from a keen legislative regard for the health, safety and welfare of the citizens of this state, the classification of "health care providers" is, on its face, a "suspect" classification affecting only a certain "chosen" few.
We address this issue searchingly, aware, as we must be, that virtually all legislation is, at the bottom line, a reaction to either a fancied or a valid public need. Only by attempting to make the finite determinations of how much of the public is really in need of legislative response to their dilemma and how much the public will be protected thereby can a court hope to chart the thin line which attempts to isolate and subordinate special interest, stimulate and protect the public interest, while also delicately balancing the charting within a constitutional framework.
It is manifest that a legislatively acknowledged situation having the potential effect of drastically proscribing the delivery of medical services to the general public demands legislative intervention and the seeking of a remedy. We have clearly progressed to the point where our citizens are entitled to such legislative stewardship as may be necessary to assure them that reasonable and proper medical services will be available at nonprohibitive costs. In its wisdom, the legislature of this state has perceived that such services will, more likely than not, be disrupted or curtailed without an appropriate statutory response to the impasse that has been created by the so-called medical malpractice explosion or medical malpractice crisis.
That such crisis does, indeed, exist is, we believe, peculiarly within the legislature's ability to determine. They have spoken, and there is nothing before us which signals so vast an incorrectness or capriciousness of such determination as to compel the substitution of our views for theirs. It is of little importance for us to parenthetically observe that the existence of the crisis (assuming that one does, indeed, exist) may well stem, at least in part, from failings within the judicial process itself. It is important that we now exercise great care in our consideration of the constitutional attack so ably mounted by plaintiff's counsel.
*1074 The statute under attack may not be the best nor the most workable solution to the acknowledged problem. What is significant is the acknowledgement of the existence of a public problem and the validity of the legislative effort to respond in a manner consistent with the public interest.
We are not delighted by the prospect of unusual procedures or unusual protections being accorded to any specified group, be they health care providers or not. Though many who fall within this definition have provided exemplary services to the community, there are others who have not and who, indeed, impose upon the public good will in annoying, overbearing and, at times, even dangerous ways, harboring the view that they, themselves, rather than the service which they provide, are something special in the mainstream of community life. Those so-called health care providers make it even more difficult for legislatures (and courts) to take the steps which recognize, distinguish, and, in perhaps marginally constitutional ways, seek to preserve and protect the vital and unique functions performed by health care providers.
Yet, in the final analysis, the overall salutary and at times quite marvelous effect that health care providers bring to the mainstream of American life requires that, when needed, an extra step of protection be granted to ensure its continuity. That is what the legislature, in its wisdom, has sought to provide by R.S. 40:1299.47 and what, in our view, is here entitled to judicial protection. The statute seeks to perform the delicate and compellingly necessary job of balancing the equities so that the end result is one of public advancement and public protection.
Finally, plaintiff argues that Flint-Goodridge Hospital of Dillard University does not fall within the purview of the medical malpractice statute, referring to R.S. 40:2102 which defines hospital for licensing purposes and simply exempts hospitals operated by colleges and universities from certain licensing requirements established for private hospitals. Nothing in the malpractice statute with which we are here concerned prohibits such hospitals from applying to the insurance commissioner for coverage and otherwise complying with its provisions; and there is nothing in this record, in the briefs filed or in the oral arguments presented which constitutes any valid basis upon which we should deny Flint-Goodridge the protection otherwise afforded by the statute.
The judgment of the district court is affirmed. All parties to this appeal will bear their own costs.
AFFIRMED.
GULOTTA, J., concurs.
GULOTTA, Judge, concurring.
We are confronted, in this appeal, solely with the question of an exception of prematurity. In this connection, I concur with the view expressed by the majority that the statute which requires review by a medical review panel is constitutional. Because we answer only that question, I am of the opinion that the real "bone of contention", i. e., the limitation of liability in the sum of $500,000.00 in a medical malpractice case, has neither been reached nor considered by the majority opinion.
Although not passed upon by the majority, I have serious concern whether the $500,000.00 limit of liability provision violates LSA-Const.1974, Art. 3, § 12(A)(7) relating to prohibited special legislation. See Martin v. Louisiana Stadium and Exposition District, 349 So.2d 349 (La.App. 4th Cir. 1977).
Assuming that my interpretation of the holding of the majority is correct, I concur with the result.
NOTES
[1] Drs. Medley and McKenna had, in due course, submitted evidence of their coverage under the statute in question, annexing to their exception certification that they were qualified and enrolled health care providers as defined by R.S. 40:1299.41 A (1) and R.S. 40:1299.42 A.
[2] We are now advised that the case will be argued before the Supreme Court of Louisiana during the first week of March, 1978.
[3] See Note, Recent Medical Malpractice LegislationFirst Checkup, 50 Tul.L.Rev. 655 (1976).
[4] R.S. 40:1299.47.
[5] R.S. 40:1299.47 B.
[6] R.S. 40:1299.47 C.
[7] R.S. 40:1299.47 A (1) and (2). This section so provides by amendment by Act 143 of 1977.
[8] R.S. 40:1299.47 C (2) and (6).
[9] R.S. 40:1299.47 A (3) and R.S. 40:1299.47 C, both as amended by Act 143 of 1977.
[10] R.S. 40:1299.47 C (8).
[11] R.S. 40:1299.47 E.
[12] R.S. 40:1299.47 G.
[13] R.S. 40:1299.47 G.
[14] R.S. 40:1299.47 G (4).